UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN HORSE PROTECTION
ASSOCIATION, INC.,

    **Plaintiff,**

v.

ANN VENEMAN, et al.,

    **Defendants.**

Civil Action 01-00028 (HHK)

**FILED**

JUL 0 9 2002

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## MEMORANDUM OPINION

Plaintiff, the American Horse Protection Association, brings this action seeking declaratory and injunctive relief pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.* Plaintiff challenges the decision of the United States Department of Agriculture ("Department" or "Agency") to enter into an arrangement with private parties wherein those parties participate in the enforcement of the Horse Protection Act ("HPA" or "Act"), 15 U.S.C. §§ 1821-1831.[1] Plaintiff asserts that the Agency's decision to allow private parties to exercise initial enforcement authority under the Act constitutes an unlawful subdelegation of the Agency's statutory responsibility.[2] Plaintiff also contends

---

[1]    The Show Horse Support Fund, a group representing organizations whose members train and breed horses for the purpose of entering them into horse shows, was permitted to intervene and align as a defendant.

[2]    The parties refer to this issue as one of unlawful delegation. Delegation typically refers to Congress's grant of authority to an agency. An agency's decision to further transfer that power to an outside body is known as subdelegation. For convenience, the court will refer to both transfers of authority

that the Agency's decision to enter into this arrangement despite specific knowledge of its shortcomings is arbitrary, capricious and an abuse of discretion. Before the court are the parties' cross-motions for summary judgment. Upon consideration of the parties' motions and the respective oppositions thereto, the court concludes that defendants' motion must be granted and plaintiff's motion must be denied.

## I. FACTUAL AND STATUTORY BACKGROUND

Many individuals breed and train horses, including a particular a type of horse known as the Tennessee Walking Horse, for the purpose of entering them in various horse shows. One of the criteria upon which a show horse is judged is the nature of its gait. The high-stepped, animated gait known as the "big lick" is highly prized because it often receives high ratings. There are two main ways to encourage horses to walk with a "big lick." One is through a careful and conscientious process of training and care for the horse over a long period of time. The other is by inflicting severe and prolonged pain to a horse's lower forelegs. The intense pain in the forelegs forces the horse to exaggerate its gait by shifting its weight to its hind legs and lengthening its stride. This practice is referred to as "horse soring."

Horse soring was considered so cruel, and became so prevalent within the walking horse community, that Congress outlawed the practice in 1970 by

---

as "delegation."

enacting the Horse Protection Act. *See* Horse Protection Act, 84 Stat. 1404 (1970) (codified at 15 U.S.C. §§ 1821-1831).[3] In the HPA, Congress declared that the "soring of horses is cruel and inhumane." *See* 15 U.S.C. § 1822. Those guilty of soring horses are subject to civil sanctions of fines and suspensions from future horse shows, as well as criminal penalties including fines and imprisonment of up to one year. *See* 15 U.S.C. § 1825.

The act establishes a multi-tiered structure to combat soring. First, it places liability on the individuals who sore horses by outlawing the showing, exhibition, sale or transport of such horses. *See* 15 U.S.C. § 1824(1-2). Second, it places liability on horse owners for any soring done to their horses. *See* 15 U.S.C. § 1824(2)(D). Third, the statute places responsibility on the managers of horse shows to ensure that participants do not enter sore horses. The Act requires managers to disqualify any sore horses from being shown or exhibited, and requires them to prohibit their sale or auction. *See* 15 U.S.C. § 1823(a-b). If managers fail to disqualify sore horses, they too are liable under the Act. *See* 15 U.S.C. § 1824(3-6).

Congress envisioned that both public and private horse inspectors would monitor compliance with the Act. The Act authorizes "Veterinary Medical Officers" (VMOs), who are Department inspectors, to inspect show horses for

---

[3]   Six years later, Congress realized that the original Act had not succeeded in eliminating the practice of horse soring and strengthened the act through a series of amendments. *See* Horse Protection Act Amendments of 1976, 90 Stat. 915 (1976).

3

evidence of soring. *See* 15 U.S.C. § 1823(e). In addition, as part of the 1976 Amendments to the HPA, *see* Horse Protection Act Amendments of 1976, 90 Stat. 915 (1976), Congress allowed horse show management to hire private inspectors, known as "Designated Qualified Persons" (DQPs), to evaluate horses at their shows. While the Act does not require horse show managers to hire DQPs, it directs the Agency to promulgate regulations governing their licensing and hiring. *See* 15 U.S.C. § 1823(c); 9 C.F.R. § 11.7 (establishing standards for DQPs). Management organizations utilizing DQPs are not liable for sore horses entered in their shows if the DQPs fail to detect that they are sore, while those who do not hire DQPs are liable. *See* 15 U.S.C. § 1824(4-6). Once violations are reported, either by VMOs or DQPs, the Agency may bring civil enforcement proceedings to punish violators of the Act. *See* 15 U.S.C. § 1825(b). Additionally, the Secretary of Agriculture can, at her discretion, refer cases to the Department of Justice for criminal prosecution. *See* 15 U.S.C. § 1826.

More than twenty years after Congress strengthened the Act through the 1976 Amendments, the Department determined that soring continued to be a problem and issued the Horse Protection Strategic Plan in 1997 ("Strategic Plan"). *See* 62 Fed. Reg. 63,510 (Dec. 1, 1997) in an effort to increase public-private cooperation in eliminating the practice. Following promulgation of the Strategic Plan, the Agency released an operating plan for calendar year 1999 designed to fulfill the Strategic Plan's goals. The 1999 plan was signed by the eight major Horse Industry Organizations (HIOs), which oversee a significant proportion of

4

the nation's horse shows. In exchange for the HIOs agreeing to abide by the standards set forth in the 1999 plan, the Agency gave the HIOs initial enforcement responsibility under the Act. Under the 1999 plan, if a DQP discovered a violation, and if the HIO imposed the proper punishment for the violation as laid out in the plan, then the Agency agreed not to institute an enforcement proceeding. The punishments detailed in the plan were less severe than the maximum punishments allowed under the statute. *See* Operating Plan for the 1999 Horse Show Season [hereinafter 1999 Plan], at 22 (providing a schedule of punishments for various violations). In cases where a VMO and a DQP disagreed over whether a horse was sore, the plan established a conflict resolution procedure. Under that procedure, if both sides ultimately agreed that the horse was sore and the HIO imposed the proper punishment as defined in the plan, the agency agreed not to institute enforcement proceedings. If the DQP and the VMO failed to resolve their dispute, however, the Agency reserved the right to undertake an enforcement action.

In calendar year 2000, the Department proposed a new plan that altered the conflict resolution procedures and limited the enforcement authority of HIOs vis-a-vis the Agency. While some HIOs signed this plan, others balked at the changes and refused to sign. As a result, the Agency eventually gave those that refused to sign the option of signing a "2000-B Plan" that was the practical equivalent of the 1999 plan.

At the end of 2000, the Department proposed a three year plan that would extend through 2003. *See* APHIS Horse Protection Operating Plan 2001-2003 [hereinafter 2001 Plan]. All eight major HIOs signed onto this plan. The 2001 plan is very similar to the 1999 plan. Specifically, the plan again gives the HIO signatories "initial enforcement responsibility" under the Act. *See id.*, at 2. In addition, in situations where both a DQP and a VMO agree that a violation has occurred, the Agency agrees to "close its files on the case" once it determines that the HIO applied and enforced the proper penalty under the plan. *Id.* at 26 n.27. In situations where a DQP and a VMO disagree about whether a violation occurred, the Agency consents to hold its investigation in abeyance while it and the HIO attempt to work out any differences through informal conflict resolution procedures. *See id.* at 25 n.25. If the two sides ultimately reach agreement and the HIO imposes the proper penalty, then the Agency will not take further action. Thus, under the 2001 plan, the only circumstances in which the Agency will bring a civil enforcement action are (1) when the VMO and the DQP agree that there is a violation, but the HIO fails to apply or enforce the appropriate punishment described in the plan, (2) when the VMO and the HIO continue to dispute whether or not a violation has occurred even after submitting to conflict resolution procedures, or (3) when the Agency determines that an HIO is either not abiding by the terms of the plan or not fulfilling the purposes of the HPA.

Plaintiff opposed the 2001 Plan, and during the drafting process, communicated its position that the Agency should not cede so much authority to

private entities. Once the plan became effective in January, 2001, plaintiff filed suit in this court seeking to bar its implementation.

## II. ANALYSIS

Plaintiff challenges the validity of the Agency's 2001 Plan on two grounds. First, plaintiff argues that assignment of "initial enforcement responsibility" to private HIOs, whereby the Agency consents not to bring an enforcement action against a violator if the HIO imposes an appropriate punishment, constitutes an unlawful delegation of enforcement authority to a private party. Second, plaintiff argues that the Agency's decision to adopt the same flawed conflict resolution procedures in 2001 that it used in 1999 and 2000 was arbitrary, capricious and an abuse of discretion. Each argument is addressed in turn.[4]

### A. Unlawful Delegation

Plaintiff argues that the 2001 Plan, by giving "initial enforcement responsibility" to private HIOs, unlawfully delegates power from the Agency to HIOs in contravention of the Horse Protection Act. Plaintiff maintains that the Agency's agreement not to bring an enforcement action when an HIO finds a violation and imposes punishment enables private parties to bring enforcement

---

[4] The Agency also contests the justiciability of this action. The Agency argues that plaintiff lacks standing and that its claim is not ripe for review. The Agency also contends that this action is not subject to judicial review because enforcement decisions are committed to agency discretion by law. The Agency's justiciability arguments are without merit.

actions in place of the government. Nowhere, plaintiff argues, does the statute authorize private parties to enforce the Act instead of the Agency. Plaintiff also argues that the plan unlawfully delegates authority to HIOs by allowing them to mete out punishments that can be dispensed only by the Agency. The Agency rejoins that the plan does not unlawfully delegate authority because the Agency retains ultimate oversight over any enforcement action taken by HIOs. The court agrees with the Agency.

Plaintiff first contends that delegations to private parties are invalid unless explicitly authorized in the statute. Because the HPA does not explicitly mention delegation to private entities, plaintiff argues that the plain language of the Act prohibits the delegations allowed under the 2001 plan. Plaintiff is mistaken. "The relevant inquiry in any subdelegation challenge is whether Congress intended to permit the delegatee to subdelegate the authority conferred by Congress." *United States v. Widdowson*, 916 F.2d 587, 592 (10th Cir. 1990). The general rule, however, is that delegations need not be expressly authorized by statute in order to be lawful. *See, e.g., Tabor v. Joint Bd. for the Enrollment of Actuaries*, 566 F.2d 705, 708 n.5 (D.C. Cir. 1977); *see also Fleming v. Mohawk Wrecking & Lumber Co.*, 331 U.S. 111, 121 (1947) (finding delegation appropriate in the absence of express authorization).

The cases upon which plaintiff relies in support of its position that Congress must explicitly authorize delegations to private parties, *Halverson v. Slater*, 129 F.3d 180 (D.C. Cir. 1997), and *Shook v. District of Columbia*, 132

F.3d 775 (1998), are inapposite. In *Halverson*, the court determined that because the text of the Great Lakes Pilotage Act authorized the Secretary of the Navy to delegate authority to the Coast Guard, it precluded delegation to anyone else. *See Halverson*, 129 F.3d at 185-86. Similarly, the statute at issue in *Shook*, the D.C. Home Rule Act, authorized the D.C. Board of Education to delegate authority to the School Superintendent. *See Shook*, 132 F.3d at 782. The court held that the plain language of the Act prohibited delegation to anyone other than the superintendent. *See id.* Thus, in both cases, the courts relied on the canon of *expressio unius* in finding the delegations unlawful.

Here, however, the canon of *expressio unius* does not apply because the HPA does not expressly authorize delegation to specific entities. Thus, there is no implication that Congress intended to prohibit delegation to anyone not mentioned in the statute. *See, e.g., United States v. Mango*, 199 F.3d 85, 90 (2d Cir. 1999) (declining to apply *expressio unius* to an agency delegation when the statute did not expressly address mention delegation); *cf. Shook*, 132 F.3d at 782 (warning that *expressio unius* should be applied cautiously because its relevance is entirely context-dependent).[5] Thus, the text of the HPA does not forbid Agency delegations.

---

[5]   Plaintiff's reliance on *American Fed'n of Gov't Employees (AFGE) v. Glickman* is equally inappropriate. In *AFGE*, the D.C. Circuit found the Department of Agriculture's delegation of inspection authority to a private party unlawful because the statute expressly required that inspections be carried out by government employees. *See American Fed'n of Gov't Employees v. Glickman*, 215 F.3d 7, 10 (D.C. Cir. 2000). The Horse Protection Act, by contrast, contains no such directive.

9

Plaintiff next argues that even if the plain language of the statue does not prohibit delegation to a private party, the law generally prohibits private delegations of the type contained in the 2001 Plan. This argument also is not persuasive. To be sure, plaintiff is correct that the law generally frowns on delegations from agencies to private actors. *See, e.g., Perot v. Federal Election Comm'n*, 97 F.3d 553, 559 (D.C. Cir. 1996) ("We agree with the general proposition that when Congress has specifically vested an agency with the authority to administer a statute, it may not shift that responsibility to a private actor . . . ."); *National Ass'n of Regulatory Util. Comm'rs v. FCC*, 737 F.2d 1095, 1143 & n.41 (D.C. Cir. 1984). Moreover, delegations to a private party are particularly suspect when the private actor's objectivity may be questioned due to a conflict of interest. *See, e.g., Sierra Club v. Sigler*, 695 F.2d 957, 963 n.3 (5th Cir. 1983); *National Park and Conservation Ass'n v. Stanton*, 54 F. Supp. 2d 7, 18 (D.D.C. 1999). Still, an agency has not engaged in unlawful delegation if it retains "final reviewing authority" over the private party's actions. *Stanton*, 54 F. Supp. 2d at 19 (citing *United Black Fund, Inc. v. Hampton*, 352 F. Supp. 898, 904 (D.D.C. 1972); *see also Assiniboine and Sioux Tribes v. Bd. of Oil & Gas Conservation*, 782 F.2d 782, 795 (9th Cir. 1986) (holding that the agency must engage in "meaningful independent review" of private action).

Because the Agency preserves final authority over the actions of HIOs, the 2001 Plan does not constitute an unlawful delegation. Although the plan specifies that the Agency "will close its files on the case" once an HIO imposes an

appropriate punishment under the plan, it will only do so "[i]f and when the Department determines that the HIO has properly applied and enforced the penalties under this Operating Plan." 2001 Plan at 26 n.27. Each time an HIO imposes punishment, the Department must engage in a meaningful review to ensure that the HIO has both chosen and imposed the proper punishment. Thus, the Agency preserves final authority over both the documentation of violations by HIOs and over the punishments they impose. Additionally, the plan indicates that the Department "intends to monitor closely the identification of violations, and the assessment of penalties by HIOs, and to take appropriate steps to address cases of HIO noncompliance." *See id.* at 4 n.8.[6] Thus, according to the plan, if at any time the Agency determines that the HIO is not taking steps to detect and penalize violations, it reserves the right to institute its own enforcement proceedings.

The Agency also retains final authority in cases submitted for conflict resolution. A footnote to the plan discussing conflict resolution procedures states that if there turns out to be no real conflict between the DQP and the VMO, then

---

[6] The court does not address the situation in which an agency reserves for itself final reviewing authority over a delegated party, but in reality merely rubber-stamps approval of private action without engaging in any meaningful review. The court notes that other courts have expressed skepticism over an agency giving wholesale approval of private action without exercising actual oversight. *See, e.g., Sigler*, 695 F.2d at 957 n.3 (noting that "rubberstamping of a consultant-prepared" Environmental Impact Statement does not constitute acceptable oversight); *Assiniboine*, 792 F.2d at 794-95 (holding that proof that an agency did not independently review the actions of a delegated party would demonstrate unlawful delegation). Because plaintiff lodges a facial challenge to the 2001 Plan, there is no evidence in the record regarding whether the Agency has engaged in meaningful review.

the Agency may institute enforcement actions if the HIO fails to impose the proper punishment. *See id.* at 25 n.25. Thus, if HIOs are manufacturing conflicts for the purpose of delaying punishment, the Agency can bypass the conflict resolution process and move forward with its own enforcement proceeding. The plan further indicates that the Agency "has the inherent authority to pursue a federal case whenever it determines the purposes of the HPA have not been fulfilled." *See id.*; *see also id.* at 4 n.8 ("The Department retains the authority to initiate enforcement proceedings against any violator when it feels such action is necessary to fulfill the purposes of the HPA."). Finally, the plan states explicitly that it does not limit the Agency's enforcement authority in any way. *See id.* at 2 n.1 ("It is not the purpose or intent of this Operating Plan to limit in any way the Secretary's authority. . . . This authority can only be curtailed or removed by an act of Congress, and not by this Plan."). Because the Agency has preserved the power to evaluate the actions of HIOs under the terms of the plan, it has not unlawfully delegated power to private parties.

**B.      Whether the Agency's Adoption of the 2001 Plan is Arbitrary and Capricious**

Plaintiff asserts that the Agency knew that the 1999 plan and 2000-B plans were flawed but failed to correct those flaws. Instead it crafted a Plan, the 2001 plan, that was virtually identical to its deficient predecessors. This, plaintiff asserts, was arbitrary and capricious. Plaintiff's position is without merit.

Under the APA, a reviewing court shall set aside agency action it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). An agency rule is arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While the court's scope of review is narrow, as it "is not empowered to substitute its judgment for that of the agency," the court should still conduct "a thorough, probing, in-depth review" of the agency's decision. *Citizens to Preserve Overton Park*, 401 U.S. at 415-16. Agency actions are presumed to be valid. *See Ethyl Corp. v. EPA*, 541 F.2d 1, 31 (D.C. Cir.) (*en banc*), *cert. denied*, 426 U.S. 941 (1976). As long as the agency considers the relevant factors and can articulate a rational connection between the facts found and the choices made, then its decision will be upheld. *See State Farm*, 463 U.S. at 43; *Marsh v. Oregon Natural Res. Council*, 460 U.S. 360, 378 (1989) (holding that agency action will not be reversed absent a clear error of judgment).

Plaintiff first argues that the Agency was aware that HIOs used the conflict resolution process as a delay tactic to avoid imposing punishments, or Agency enforcement actions, but that the Agency decided not to change it. It is true that the Agency realized that the conflict process was misused. In the Administrative

13

Record, the Agency notes that HIOs often created artificial conflicts over minor issues in situations where the DQP and the VMO both agreed that a violation existed. Plaintiff asserts that the HIOs created delay by invoking the conflict resolution process, because no punishment would be imposed until the process had run through to completion.

Although plaintiff understandably is concerned about abuse of the conflict resolution process, the 2001 plan appears to reasonably addresses that concern. The plan provides that "[i]f during the Conflict Resolution process, it becomes apparent that the findings of the VMO and DQP are the same or similar and result in the same HPA violation, the process will cease." 2001 plan, at 25 n.25. The plan also goes on to state that after the process ceases, if the HIO fails to apply the proper punishment, the Agency will pursue a federal case. *See id.* Thus, under the 2001 Plan, the Agency can combat the HIO's delay tactics by instituting its own enforcement proceedings.

Plaintiff next argues that the Agency's decision to close its files on certain cases will allow violators of the Act to escape punishment. During 1999 and 2000, HIOs would agree to impose punishments as outlined in the operating plans when violations were documented. Upon doing so, the Agency would close its file on the case. Plaintiff asserts that HIOs then would typically overturn their self-imposed punishments through their own internal appeal processes. As a result, in many cases no punishment was imposed by either the HIO or the Agency because by the time the punishments were overturned by the HIO, the Agency had already

closed its file. Plaintiff argues that the 2001 plan will result in under-punishment of violators for the same reasons.

Plaintiff's contention cannot be sustained because the 2001 Plan again appears to appropriately respond to plaintiff's criticisms. Under the plan, the Agency will not close its files on any case until it determines that the HIO has both "applied *and enforced*" the penalties under the plan. 2001 Plan, at 26 n.27 (emphasis added). Thus, if the HIO overturns a DQP's finding of a violation, then according to the plan, the Agency will not close its files on the case.

Plaintiff argues finally that the Agency should not have stuck with its flawed enforcement strategy in light of its knowledge that many HIOs were not abiding by the terms of the operating plans. For example, plaintiff points out that during 1999 and 2000, the Agency was aware that HIOs were not detecting and documenting violations of the Act, were not properly applying the Agency's standards as to what constitutes a violation of the Act, and were not imposing the proper penalty when they did find a violation. Given the HIOs' failure to abide by the plan, plaintiff alleges that the Agency should not have continued to delegate authority to them.

Although plaintiff's allegations regarding the HIO's competence and effectiveness in detecting and documenting violations may be true, they do not demonstrate any particular fault of the plan. They show only that HIOs are not complying with the plan's terms. As the plan makes painfully clear, the Agency need not accede to private enforcement actions when the HIOs are not following

15

the plan or are not fulfilling the purposes of the statute. The Agency would still be able to launch its own enforcement proceedings against violators when HIOs do not follow the plan's requirements. Plaintiff's dispute here is not with the terms of the plan, but with whether or not the Agency and the HIOs are actually following the plan. This argument does not implicate whether the plan itself is flawed.

In rejecting plaintiff's argument that the 2001 Plan is arbitrary and capricious, the court is guided by the Supreme Court's decision in *Heckler v. Chaney*, 470 U.S. 821, 832 (1985). In *Chaney*, the Supreme Court held that agency enforcement decisions are presumptively unreviewable because an Agency's decision whether or not to initiate an enforcement proceeding requires it to balance a number of factors – the chance of success, consistency with agency policy, and the allocation of scarce resources – which are matters of Agency expertise. *See Chaney*, 470 U.S. at 831-32. Although *Chaney*, which addressed whether courts have jurisdiction over agency non-enforcement decisions, does not preclude judicial review in this case, "for the purposes of determining the reasonableness of [agency action], the policies underlying *Chaney* retain persuasive force." *Shell Oil Co. v. EPA*, 950 F.2d 741, 764 (D.C. Cir. 1991).

In deciding whether to adopt the 2001 plan and in deciding how to best enforce the HPA, the Agency must establish the same enforcement priorities that the *Chaney* Court concluded should not be subject to judicial scrutiny. *See Chaney*, 470 U.S. at 831-32. As the Agency points out, after carefully reviewing

16

the Act for several years, it concluded that given its budgetary constraints and the inability of government inspectors to attend the vast majority of horse shows,[7] cooperation with private HIOs was the best way to maximize enforcement of the Act. According to the Agency, if the HIOs did not agree to a plan, the overall number of violations might increase, because HIOs might be less inclined to utilize DQPs, and because HIOs would not be bound to impose penalties as severe as those contained in the 2001 plan. Given the refusal of several HIOs to sign onto proposed plans that deviated from the 2001 plan, the Agency ultimately determined that a less-than-perfect plan was better than no plan at all. Additionally, the Agency calculated that giving HIOs initial enforcement authority would allow it to devote its limited resources toward increasing its inspections at shows that are not affiliated with an HIO. Because an Agency's determination of its enforcement priorities "often involves a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," *Chaney*, 470 U.S. at 831, the court cannot say that the Agency's decision to adopt the enforcement scheme laid out in the 2001 Plan is unreasonable.

### III. CONCLUSION

---

[7]   In 1999, Agency inspectors only attended 12.5% of all shows, sales, auctions and exhibitions where DQPs were also present and only inspected 20% of the horses inspected by DQPs. In addition, the Agency only attended eight "unaffiliated" shows, which are shows not operated by one of the eight major HIOs.

For the foregoing reasons, defendants' motion for summary judgment must be granted and plaintiff's motion for summary judgment must be denied. An appropriate order accompanies this memorandum.

/Henry Kennedy, Jr./
Henry H. Kennedy, Jr.
United States District Judge

Dated: July 9, 2002